UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. _____ |
| Plaintiff, | **COMPLAINT FOR CIVIL PENALTIES, PERMANENT INJUNCTION, AND OTHER RELIEF** |
| v. | |
| R360 LLC, a limited liability company, and | |
| STEVEN DOUMAR, individually and as an officer of R360 LLC, | |
| Defendants. | |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges that:

1.     The FTC brings this action under Sections 5(a)(1), 5(m)(1)(A), 13(b), 16(a), and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a)(1), 45(m)(1)(A), 53(b), 56(a), and 57b, and Section 8023 of the Opioid Addiction Recovery Fraud Prevention Act of 2018 ("OARFPA"), 15 U.S.C. § 45d, to obtain monetary civil penalties, a permanent injunction, monetary relief, and other relief for Defendants' violations of Section 5 of the FTC Act and Section 8023 of OARFPA.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

3.      Venue is proper in this District under 15 U.S.C. § 53(b) and 28 U.S.C.
§§ 1391(b)-(c) and 1395(a).

**PLAINTIFF**

4.      The FTC is an independent agency of the United States Government created by
the FTC Act, which authorizes the FTC to commence this district court civil action by its own
attorneys.  15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C.
§ 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC
also enforces OARFPA, which prohibits unfair or deceptive acts or practices with respect to any
substance use disorder treatment service or substance use disorder treatment product.  15 U.S.C.
§ 45d(a).

**DEFENDANTS**

5.      Defendant R360 LLC is a Florida limited liability company formed in 2016 with
its principal place of business at 6330 N. Andrews Avenue, Ft. Lauderdale, Florida 33309.  R360
LLC transacts or has transacted business in this District and throughout the United States.  At all
times material to this Complaint, acting alone or in concert with others, R360 LLC has
advertised substance use disorder treatment services to consumers throughout the United States.

6.      Defendant Steven Doumar ("Doumar") is the sole officer, director, employee, and
owner of R360 LLC.  At all times material to this Complaint, acting alone or in concert with
others, he has formulated, directed, controlled, had the authority to control, or participated in the
acts and practices of R360 LLC, including the acts and practices set forth in this Complaint.  In
connection with the matters alleged herein, Doumar transacts or has transacted business in this
District and throughout the United States.

2

## COMMERCE

7.     At all times material to this Complaint, Defendants have maintained a substantial

course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act,

15 U.S.C. § 44.

## BACKGROUND ON SUBSTANCE USE DISORDERS AND TREATMENT

8.     Substance use disorders occur when recurrent use of alcohol or drugs (or both)

causes clinically significant impairment, including health problems, disability, or failure to meet

major responsibilities at work, school, or home.  According to the results of the 2018 National

Survey on Drug Use and Health, ("NSDUH 2018") conducted by the Substance Abuse and

Mental Health Services Administration ("SAMHSA") of the United States Department of Health

and Human Services, approximately 20.3 million people aged 12 or older had a substance use

disorder in 2018 related to the use of alcohol or illicit drugs.  Also according to NSDUH 2018,

approximately 21.2 million people aged 12 or older – or about 1 in 13 people in that age group –

needed substance use treatment for problems related to use of alcohol or illicit drugs in the

previous year.  However, only 3.7 million people received any type of treatment, including

counseling, attendance at self-help group meetings, or treatment for medical problems associated

with alcohol or drug use.  Of those who received treatment, an estimated 2.4 million received

substance use treatment from a specialty facility, including a hospital (on an inpatient basis),

mental health center, or drug or alcohol rehabilitation facility (as either an outpatient or

inpatient).

9.     Individuals who seek treatment for a substance use disorder at a specialty alcohol

or drug rehabilitation center have many options to choose from.  SAMHSA conducts an annual

census of facilities providing substance abuse treatment throughout the country and publishes data on their characteristics. The 2018 National Survey of Substance Abuse Treatment Services report summarizes responses from 14,809 different facilities. The characteristics of the facilities varied widely. While most offered outpatient treatment (83%), far fewer offered residential treatment (24%) or hospital inpatient (5%) options. Only ten percent of the treatment facilities offered opioid treatment programs that were certified by SAMHSA for the provision of medication-assisted therapy with methadone, buprenorphine, or naltrexone. While 83 percent of facilities offered at least one program tailored for specific types of clients, half or fewer offered a treatment program tailored to individuals with co-occurring mental and substance abuse disorders (50%), adult women (49%), clients who have experienced trauma (40%), clients who have experienced sexual abuse (26%), adolescents (25%), pregnant women (23%), seniors or older adults (21%), LGBT clients (20%), or active-duty military members (11%). Fifty-one percent of facilities offered treatment services in languages other than English. Only 20% of the facilities offered any type of detoxification services. Ninety percent of facilities reported accepting cash or self-payment for services, while 71% accepted private insurance, 66% accepted Medicaid, and 36% accepted Medicare.

10. According to NSDUH 2018, the majority of individuals who recognize that they need treatment for a substance use disorder make no effort to seek substance abuse treatment at a specialty facility. Among those individuals who recognized that they needed treatment and yet did not receive it, commonly stated reasons for failing to obtain treatment included not being able to afford the cost (32.5%), and not knowing where to get treatment (21.1%).

## DEFENDANTS' BUSINESS ACTIVITIES

11.     Since at least early 2017, R360 LLC has provided marketing services to companies that provide treatment services to consumers suffering from substance use disorders ("Treatment Centers").  R360 LLC promoted its client Treatment Centers by running television advertisements for the "R360 Network," purported to be a nationwide network of addiction recovery specialists.  To become a member of the R360 Network, Treatment Centers entered into contracts with R360 LLC that required the payment of monthly or annual fees to R360 LLC. Consumers who called in response to ads for the R360 Network would be routed to one of the Treatment Centers that had entered into such a contract with R360 LLC.  In addition to monthly or annual marketing fees, Treatment Centers also typically paid R360 LLC a fee for each call they received from a consumer responding to an ad for the R360 Network.

12.     Ads for the R360 Network did not mention any particular Treatment Centers by name.  Instead, advertisements promised consumers that the R360 Network would direct persons seeking help with substance use disorders to ethical, high-quality, hand-selected Treatment Centers.  Doumar had sole creative and editorial control over all television advertising for the R360 Network, as well as the R360 Network website and Facebook page.

13.     Beginning in early 2017, Defendants began airing 30-second and 60-second short-form television ads promoting R360 Network.  Doumar wrote all of the scripts for the ads. These ads featured Kenneth Seeley ("Seeley"), a well-known interventionist who has regularly appeared on the A&E television show *Intervention*.  In the ads, Seeley – identified as an author, former addict, and "Addiction Recovery Specialist" – implored viewers struggling with drug or

alcohol addiction to call the R360 Network's "Nationwide Network of Addiction Specialists" to get the help they needed.

14.     These short-form ads first aired between approximately January and April 2017. During that time, the R360 Network had only one Treatment Center as a member.  Any consumer who called a telephone number displayed during the short-form ads would be connected to this Treatment Center, which had a single location in Florida.  Defendants also ran these short-form ads from approximately March 2018 through February 2019.

15.     In approximately April 2017, Defendants filmed a long-form television ad for the R360 Network.  The ad had a talk-show format and was hosted by journalist and author Jane Velez-Mitchell.  The ad also featured Seeley and Dr. Harry Haroutunian, the former medical director of the Betty Ford Center.  In the ad, R360 LLC represented that the R360 Network was comprised only of the highest quality, cream of the crop, ethical Treatment Centers that had been hand-picked by Seeley.  This advertisement contained the following statements, among others (Exhibit A):

> A.     JANE VELEZ-MITCHELL: Well, speaking of treatment centers, getting into the right treatment center is perhaps the most crucial decision you can make when you're getting sober. So how do people do that?
>
> KEN SEELEY: Well, I'm fortunate because I've been working in the field for so long, so I've been out there to all these treatment centers all over the country and I was able to see which ones are doing things ethically. So we handpicked those.
>
> JANE VELEZ-MITCHELL: So you apparently have a system –
>
> KEN SEELEY: Yes.
>
> JANE VELEZ-MITCHELL: – to get the cream of the crop –
>
> KEN SEELEY: Yes.

JANE VELEZ-MITCHELL: – when it comes to treatment centers and get rid of the bad guys.

KEN SEELEY: Yeah. And seeing the bad guys and hearing about the bad guys and all the negative things that they're doing, I mean, they're patient brokering, they're overbilling for urine tests,  they're doing all these unethical practices that are creating a bad name for all the treatment centers. But because we hand-selected the good ones and we know who they are, that's the way to find them is, you know, let us show you the ones of the 17-plus years of me out there working in the trenches, let's give you the right treatment centers.

JANE VELEZ-MITCHELL: So how do people, through you, get to those good treatment centers.

KEN SEELEY: Here, call us now.

ON SCREEN: R360Network
          Call Now:
          Help is Standing By:

B.     FEMALE ANNOUNCER: If you or someone you love are struggling with addiction, you need to call the R360Network now.

ON SCREEN: R360Network Treatment Centers
          Selected From The Very Best In The Nation
          CALL NOW
          R360Network
          The call is FREE Secure and Confidential

FEMALE ANNOUNCER: R360 treatment centers are selected from the very best in the nation.

C.     KEN SEELEY: I want to introduce you to Madison, who's been through numerous treatment centers….

KEN SEELEY: And explain how it was for you when you first had to pick up that phone and the fears that you had.

ON SCREEN: MADISON H.
          RECOVERING ADDICT
          R360Network.

7

MADISON H.: – I didn't know who to call, I didn't know where to look. I had no idea about treatment or detox or what it entailed….

JANE VELEZ-MITCHELL: Let me ask you this, do you wish you had had a number that you could have called that would have streamlined the whole process for you and put you in the treatment center that was right for you?

MADISON H.: That would have made it a lot easier, yeah, definitely.

KEN SEELEY: And you're already struggling, you're already struggling at that –

MADISON H.: Yeah.

KEN SEELEY: – crucial time, and trying to figure out where to go makes it even much more difficult. So having this number to call that we vetted and found treatment facilities that are the best of the best, the cream of the crop. And that's what this is really about, is helping people that were sitting where you are right now and getting to the place where you're at because going to treatment does help.

JANE VELEZ-MITCHELL: Because you don't always find the right treatment center on your own. So how many treatment centers have you been to?

MADISON H.: Probably around eight or ten.

JANE VELEZ-MITCHELL: Whoa.

KEN SEELEY: Whew.

JANE VELEZ-MITCHELL: And what – what made some better than others?

MADISON H.: The staff that was there definitely had a huge influence on being able to talk openly to them; the activities they had us do; the structure for sure; and the facility as a whole, I mean, like you want it to be attractive and fun and appealing.

8

*** 

KEN SEELEY: And that's so important. Finding the right staff and finding the right facility, that's what we're going to do for you. We're going to help you find the place that will help you unravel that trauma and get a comfortable place where you could – go through there and nurture yourself, learn how to love yourself, and get the help that you desperately need. That's what we're here to do.

D.    JANE VELEZ-MITCHELL: So you're an expert. How do you figure out what treatment center to go to? I mean, obviously, Betty Ford, you've treated many celebrities. That's perhaps the most famous treatment center in the entire world. But not everybody can go to Betty Ford. Are there other good treatment centers out there and how do you find them?

DR. HARRY HAROUTUNIAN: There are many good treatment centers out there, but I should say that celebrity was just a small portion of the people we treated at the Betty Ford Center. So, first of all and foremost, addiction is not the same in every person and treatment should be individualized. That starts out with a thorough evaluation. This is a psychosocial, biological and spiritual disease.

***

JANE VELEZ-MITCHELL: … I want to know what happens in a treatment center.

DR. HARRY HAROUTUNIAN: It really depends on how sick a person is when they come in…. And so a typical day is to get up in the morning early, go to an AA meeting or other 12-step kind of meeting –

KEN SEELEY: Yeah.

DR. HARRY HAROUTUNIAN: – depending on the drug being used, go to the gym, have a good breakfast, get to your first primary therapeutic group, which is critical, probably one-on-one therapy during the course of the day. There are specialty groups and relapse prevention and education about the nature and the disease of alcoholism, family issues.

KEN SEELEY: And that's one of the things we look at when we have somebody deciding to be a part of our network. We want to make sure that they're the best.

DR. HARRY HAROUTUNIAN: But the beautiful part about the network is that you're guaranteeing that the personnel that are delivering the personalized service are qualified.

KEN SEELEY: Yes.

DR. HARRY HAROUTUNIAN: That's critical. You want to have Master's level at least or doctoral level therapists working on a patient, who can specifically deal with the patient. You want to be able to treat the person for all of the co-occurring experiences, co-dependents, chronic pain issues, trauma, but not too early in the treatment experience.

KEN SEELEY: Sure.

***

JANE VELEZ-MITCHELL: …. Well, I think this is a huge leap that now there is a number to call where people can get help and it filters everybody through to the best treatment centers. Don't you think that's kind of revolutionary, Doctor?

DR. HARRY HAROUTUNIAN: From my perspective, it saves me a lot of work. Do you have any idea how many patients I'll treat that have made the wrong decision on the wrong center?

KEN SEELEY: Mm-hmm.

DR. HARRY HAROUTUNIAN: It wasn't right for them or were sold a bill of goods or the staff was not engaged or they just didn't have the credentials.

JANE VELEZ-MITCHELL: If there's a person out there watching who knows they have a relative, a  son, a daughter, a wife, mother, who has a problem,  what would you tell that relative to do, vis-a-vis,  calling that number?

DR. HARRY HAROUTUNIAN: I would say that you have to act like death is imminent, that you will save a life….

16.     At the time that the infomercial was filmed, in approximately April 2017, the R360 Network had zero members.

17.     Defendants aired the infomercial nationwide beginning in approximately May or June 2017, until early 2019.  During that period, no more than four Treatment Centers were members of the R360 Network at any given time, although some of the Treatment Centers had more than one location.

18.     Calls that were received in response to the infomercial were automatically routed to a Treatment Center that was an R360 Network member.  Incoming calls were not first screened by anyone to assess the caller's particular needs.  Therefore, callers had no opportunity to indicate their preferences for treatment characteristics – for instance, whether the caller desired residential or outpatient treatment, whether the caller desired a medical detox, whether the caller was willing to travel to a distant geographical location for treatment, whether the caller needed a Treatment Center that would accept Medicaid, or whether the caller wanted a single-sex treatment program – before being transferred directly to an R360 Network member.

19.     Doumar was responsible for recruiting Treatment Centers to become members of the R360 Network.  Doumar had no educational or professional experience in the fields of substance use disorder, addiction treatment, or mental health.  Several other individuals also performed services for R360 LLC and communicated with Treatment Centers on R360 LLC's behalf, but with the exception of Seeley, none of them had any educational or professional experience in the fields of substance use disorder, addiction treatment, or mental health.

20.     When R360 LLC began to recruit Treatment Centers to join the R360 network, Seeley provided R360 LLC with the names of dozens of Treatment Centers that Seeley

recommended and whose owners Seeley knew.  However, almost all of these Treatment Centers declined to join the R360 Network.  Doumar then compiled lists of additional Treatment Centers that he considered potential candidates to join the R360 Network and directed others to conduct outreach efforts to attempt to get the Treatment Centers to join.  Doumar compiled these lists of potential R360 Network members after conducting internet searches and walking through booths at industry trade shows.

21.     Doumar was responsible for assessing the quality of Treatment Centers that might join the R360 Network, and he made the ultimate decision as to which Treatment Centers would join.  At most, Doumar's evaluation consisted of asking Treatment Center personnel general questions, such as whether their facilities were accredited, had liability insurance, had a medical director, had licensed staff, and met local fire codes.  Doumar took any responses he received on these topics at face value and did not conduct any independent research to verify that the information provided by representatives of the Treatment Centers was in fact true.

22.     To the extent Doumar communicated with Treatment Centers about these topics, he did so in only the broadest terms.  For instance, if he asked a Treatment Center representative whether it had liability insurance, he did not inquire as to the amount of insurance coverage or whether any injury or malpractice claims had been filed against the Treatment Center.  If Doumar asked if the Treatment Center had a medical director, he did not inquire as to the director's educational background, work experience, or particular qualifications for the position. In no instance did Seeley, or anyone with expertise in substance use disorder treatment acting on R360 LLC's behalf, visit a Treatment Center in person, or speak to current or former patients of

a Treatment Center, to assess whether the quality of services provided met any particular standards required to join the R360 Network.

23.     Given the large number of Treatment Centers in the United States, in many instances, Seeley had no prior professional experience or direct knowledge of the practices of specific Treatment Centers that R360 LLC was considering to bring on as members of the R360 Network.  Doumar signed up numerous Treatment Centers as members of the R360 Network even when Seeley lacked any personal knowledge regarding those Treatment Centers' business practices.

## VIOLATION OF THE OPIOID ADDICTION RECOVERY FRAUD PREVENTION ACT OF 2018

24.     The Opioid Addiction Recovery Fraud Prevention Act of 2018 ("OARFPA"), P.L. 115-271, 15 U.S.C § 45d, was enacted on October 24, 2018.  OARFPA prohibits unfair or deceptive acts or practices with respect to any substance use disorder treatment service or substance use disorder treatment product.  15 U.S.C. § 45d(a).  Section 8022 of OARFPA defines "substance use disorder treatment service" to mean "a service that purports to provide referrals to treatment, treatment, or recovery housing for people diagnosed with, having, or purporting to have a substance use disorder, including an opioid use disorder."  P.L. 115-271 § 8022.

25.     Pursuant to 15 U.S.C. § 45d(b)(1), a violation of 15 U.S.C. § 45d(a) shall be treated as a violation of a rule under Section 18(a) of the FTC Act, 15 U.S.C. § 57a(a), regarding unfair or deceptive acts or practices.

26.     Defendants violated OARFPA as described below, with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

27.     Each dissemination of an advertisement in which Defendants violated OARFPA by making one or more of the deceptive representations described below after October 24, 2018, constitutes a separate violation for which Plaintiff seeks monetary civil penalties.

28.     Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Public Law 114-74, sec. 701, 129 Stat. 599 (2015), and Section 1.98(d) of the FTC's Rules of Practice, 16 C.F.R. § 1.98(d), authorizes this Court to award monetary civil penalties of not more than $46,517 for each violation of OARFPA after January 10, 2022, including penalties whose associated violation predated January 10, 2022.

## Count I

29.     In numerous instances in connection with the advertising, marketing, and promotion of substance use disorder treatment services after October 24, 2018, including through the means described in Paragraphs 11-17, Defendants have represented, directly or indirectly, expressly or by implication, that:

    a.  Consumers who called the telephone numbers provided in ads for the R360 Network would be connected to an addiction treatment specialist who would consider the caller's individual needs and make a personalized assessment to refer the caller to the best Treatment Center for his or her particular situation;

    b.  Seeley used his expertise in substance use disorders and addiction treatment to evaluate Treatment Centers in the R360 Network and hand selected each R360 Network member; and

14

    c.  Defendants evaluated each of the Treatment Centers in the R360 Network against meaningful, rigorous, objective criteria.

30.    In truth and in fact:

    a.  Consumers who called the telephone numbers provided in ads for the R360 Network received no personal assessment, but were instead immediately routed to a Treatment Center without regard for their individualized needs;

    b.  Seeley did not use his expertise in substance use disorders and addiction treatment to evaluate Treatment Centers in the R360 Network and did not hand select each R360 Network member; and

    c.  Defendants did not evaluate the Treatment Centers in the R360 Network against meaningful, rigorous, objective criteria.

31.    Therefore, the making of the representations as set forth in Paragraph 29 constitutes a deceptive act or practice in violation of Section 8023(a) of OARFPA, 15 U.S.C. § 45d(a).

## VIOLATION OF THE FTC ACT

32.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."  Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### Count II

33.    In numerous instances in connection with the advertising, marketing, and promotion of substance use disorder treatment services, including through the means described

in Paragraphs 11-17, Defendants have represented, directly or indirectly, expressly or by implication, that:

    a.   Consumers who called the telephone numbers provided in ads for the R360 Network would be connected to an addiction treatment specialist who would consider the caller's individual needs and make a personalized assessment to refer the caller to a Treatment Center appropriate for his or her particular situation;

    b.   Seeley used his expertise in substance use disorders and addiction treatment to evaluate Treatment Centers in the R360 Network and hand selected each R360 Network member; and

    c.   Defendants evaluated each of the Treatment Centers in the R360 Network against meaningful, rigorous, objective criteria.

34.    In truth and in fact:

    a.   Consumers who called the telephone numbers provided in ads for the R360 Network received no personal assessment, but were instead immediately routed to a Treatment Center without regard for their individualized needs;

    b.   Seeley did not use his expertise in substance use disorders and addiction treatment to evaluate Treatment Centers in the R360 Network and did not hand select each R360 Network member; and

    c.   Defendants did not evaluate the Treatment Centers in the R360 Network against meaningful, rigorous, objective criteria.

16

35.     Therefore, the making of the representations as set forth in Paragraph 33 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

36.     Consumers have suffered substantial injury as a result of Defendants' violations of the FTC Act and OARFPA.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act and OARFPA by Defendants;

B.     Award Plaintiff monetary civil penalties from Defendants for each violation of OARFPA alleged in this Complaint;

C.     Award monetary and other relief within the Court's power to grant; and

D.     Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated: 5/12/22

CHRISTINE L. DELORME
(Special Bar ID A5502888)
KAREN MANDEL (Special Bar ID A5501752)
Attorneys, Division of Advertising Practices
Federal Trade Commission
600 Pennsylvania Ave. NW
Washington, DC 20580
Tel: 202-326-2095, -2491
Fax: 202-326-3259
cdelorme@ftc.gov
kmandel@ftc.gov

17